IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ARIEL LAND OWNERS, INC.,            :
                                    :
        Plaintiff,                  :      CIVIL ACTION NO. 3:CV-01-0294
                                    :
        v.                          :
                                    :           (JUDGE CAPUTO)
LORI DRING, ET AL.,                 :
                                    :
        Defendants.                 :

**MEMORANDUM**

     Ariel Land Owners, Inc. ("ALO"), the Plaintiff, is a corporation comprised of a group

of homeowners in a lake community which seeks, by this suit, to quiet the title to Lake

Ariel ("the Lake").   ALO claims to own the Lake by virtue of a series of deeds, a

determination by the Court of Common Pleas of Wayne County as to a boundary fronting

on the Lake in which the Defendants were not a party, reputation evidence of the

community as to the boundary of the Lake, and that ALO maintained the Lake at the high

water mark of 1425.9 feet above sea level.

     The Defendants are Lori Dring and Nancy Asaro, residents of New Jersey, who

purchased land on the westerly side of the Lake and westerly side of Mud Pond.[1]   Ms.

Asaro and Ms. Dring (hereinafter "Asaro/Dring") defend the ALO claim to the title to the

Lake to the boundary of 1425.9 feet contending that there has been no adequate proof

---

[1]    ALO claims that Mud Pond has no existence separate from the Lake.  The
Defendants claim that Mud Pond is a separate body of water from the Lake and is
connected to the Lake by a non-navigable stream of approximately 1,100 feet in length.

of title ownership to such an extent.  In addition, Asaro/Dring have filed a counterclaim asserting that they have established prescriptive rights in the Lake by an easement from Robert Swingle, and Asaro/Dring seek to establish rights in the Lake by virtue of activities of Mr. Swingle on the property over a period of years.   Asaro/Dring also claim that they own a strip of land between the boundary of the west shore property owners and the Lake that was never conveyed to the current property owners and their predecessors in title.  Rather, Asaro/Dring claim that the portion was reserved by virtue of a series of 1862 deeds from Weston to Jones and Barnes, and they claim title to it by deeds of the owners of the reservation. Lastly, Asaro/Dring claim that the Lake and Mud Pond are two separate bodies of water and that there is a non-navigable stream between Mud Pond and the Lake.  They contend this stream not only exists, but that their property borders on the stream, and therefore their property extends to the center of the stream.[2]

The Court has jurisdiction under 28 U.S.C. § 1332(a), diversity of citizenship.  The Court will therefore apply the law of Pennsylvania.  *Erie R. R. Co. v. Tompkins*, 304 U.S. 64 (1938).

The case was tried before the Court without a jury, and the following is the Court's discussion of the issues and its findings of fact and conclusions of law.

---

[2]     In a Memorandum and Order dated September 30, 2005, deciding two motions for summary judgment, the following was decided by the Court: (1) the ownership of the land bordering the Lake and ownership of a portion of the Lake bed did not give Asaro/Dring a right to full use and enjoyment of the entire Lake, (2) there are genuine issues of material fact as to whether Mr. Swingle had acquired a prescriptive easement for the use of the disputed water area and what those acquired uses might be, and (3) if the predecessors in title to Asaro/Dring held any prescriptive rights, they were conveyed to Asaro/Dring by the deed of July 12, 2001.

**DISCUSSION**

**A.    The Quiet Title Action**

As noted, ALO claims that it owns the Lake to a level of 1425.9 feet above sea level.  Admittedly, this level fluctuates because of a weir, or dam, which maintains a level in the summer time of 1425.9 feet.  In the winter, the dam is opened, and the Lake settles at a level of 1423.5 feet.  While the date of the construction of the dam/weir is not clear, it is clear, by a preponderance of the evidence, that the dam or weir has been there in excess of fifty years.  (Testimony of Michael Malakin and Testimony of Gordon Florey). There were other dams at the Lake, but it is not possible to determine exactly when they existed relative to the issues in this case.  Moreover, there is some evidence of dams prior to 1883, and because of references to high and low water marks, it is apparent something caused a significant enough change in the level of the Lake to warrant that reference.  ALO claims that it owns the Lake to the extent of the watermark of 1425.9 feet by virtue of a deed that it received from Schrader on April 20, 1964. (Pl.'s Ex. 151R.)

The deed from Schrader to ALO refers to two parcels which emanate from two chains of title.  One can be traced back to 1829.  It is three hundred (300) acres and is the land conveyed to Thomas Cadwalder from Elizabeth Tilghman. (Pl.'s Ex. 151B.) The other can be traced back to 1833 and is land conveyed to Asa Jones from Elizabeth Tilghman (Pl.'s Ex. 151C.)  It is thirteen and one-half (13.5) acres.  ALO contends this constitutes record title to Lake Ariel and Mud Pond.  There are several problems with this conclusion.  First, there is no boundary to Lake Ariel and Mud Pond described in the chains of title.  The large parcel in the 1964 deed comes from a chain which includes a

3

deed from John Torrey to Simon Swingle dated 1877. (Pl.'s Ex. 151F.)  In this deed, covering three hundred (300) acres, the land is described as "including all or nearly all of the ponds called Jones Pond and Marsh Pond . . ." *Id.*  The second or smaller parcel in the 1964 ALO deed is thirteen and one-half (13.5) acres, and it is unclear whether it is all covered with water or whether upland area was conveyed as well.

Therefore, I do not find by a preponderance of evidence that the deed into ALO in 1964 conveys title to the Lake and Pond.  It is certain that it conveys some of it, but the amount is simply not established by a preponderance of evidence.  There are no metes and bounds descriptions of the Lake and Pond in the chain of title, nor are there any other descriptions of the area covered by water.[3]

Further comment is necessary.  All of the parties to this action, including ALO, Asaro/Dring and Karl R. and Alice L. Iffland, trace their titles to a deed to Edward Tilghman from the Sheriff of Wayne County in February, 1801.[4]  (Pl.'s Ex. 151.)  In 1820, Tilghman's executors conveyed approximately two-thirds of Lake Ariel to Asa Jones and the remaining part of the Lake, together with the property on the west shore, which includes Asaro/Dring and Iffland lands to Thomas Cadwalder in 1828.

---

[3]     At the close of Plaintiff's case, Defendants/Counterclaim Plaintiffs moved for dismissal under Rule 50 of the Federal Rules of Civil Procedure on the basis that Plaintiff failed to introduce sufficient evidence of the acquisition by title to the property covered by water to a level of 1425.9 feet.  Defendants/Counterclaim Plaintiffs moved for reconsideration of that denial. (Doc. 234.)  Given the Court's finding that Plaintiff failed to prove ownership by title of the subject property, the motion is moot.

[4]     The Ifflands own approximately sixty (60) properties on the west shore of the Lake and are impacted by the claim by Asaro/Dring that they own the strip of land between the high watermark and the so-called normal margin of the Lake.  This has been resolved amicably between the Ifflands and Asaro/Dring.

(Pl.'s Exs. 151B, 151C.)  Jones' heirs and Cadwalder's executors transferred their interests in the Lake to Simon Swingle by deeds dated in 1872 and 1883 respectively. (Pl.'s Exs. 151F, 151G.) As a result, Swingle owned the entire interests which were previously owned by Tilghman.  As noted, there are no metes and bounds descriptions in any of these deeds, and therefore, the Lake has never been described by metes and bounds or in any other fashion.  Moreover, the deed granted to Swingle is a remnant deed, and to be certain of what was conveyed, all prior deeds out of Swingle's grantor would have to be reviewed to determine exactly what Swingle was granted.  This exercise was not performed at trial.  I am satisfied that there is no proof of record title to Lake Ariel and Mud Pond by ALO by a preponderance of evidence.[5]

Asaro/Dring argue that even if there were title to Lake Ariel and Mud Pond, there is a cloud on that title because they own a portion of land on the western shore between the high water mark and the natural margin.  This claim is centered in a deed from Cadwalder to Edward Weston on the west shore of the Lake in 1859 and conveyances out of Weston in 1862 which Asaro/Dring contend reserved to Weston (through whom they claim record title) land between the high water mark and the natural or normal margin.  This issue also impacted on Counterclaim Defendants including ALO and individual owners such as Karl R. Iffland and Alice Iffland.  A Settlement Agreement was reached which resolves a portion of the dispute over ownership of the strip of land

---

[5]     Plaintiff contends that defense expert, Anthony Waldron, Esquire, opined that the 1964 deed did convey the entire Lake and Pond.  However, Mr. Waldron falls short of so opining, noting that the large description in the 1964 conveyance to Plaintiff is a remnant deed and so references itself as such and there has not been an analysis of the deeds out to assure these part(s) of the water were not conveyed elsewhere.  (*See* Waldron Testimony R-179 through 182.)

between the high water mark and the natural margin on the western shore.

Paragraph 2 of the Settlement Agreement executed on August 28, 2006 states that Asaro/Dring agreed to subdivide the strip of land along the western shore of Lake Ariel along the southerly property line of Lot 48, Block owned by Maryanne Gillespie (as shown on the Tax Map No. 12-03, marked for identification as Exhibit DT-70 in the lawsuit). (Jt. Ex. 1, ¶ 2.) In the Settlement Agreement, that portion of the Western Shore Strip north of the subdivision line was thereafter called the North Strip, and that portion of the Western Shore Strip south of the subdivision line was called the South Strip. (*Id.*) In Paragraph 3 of the Agreement, Asaro/Dring agreed to execute and deliver to ALO a quit claim deed of all of their right, title, and interest in and to the North Strip, subject to a permanent easement to be granted in favor of the owners of lots near the western shore of Lake Ariel for access over the North Strip and to maintain docks and/or boathouses on the North Strip. (*Id*. ¶ 3.) While the Agreement disposes of any dispute concerning the North Strip, the Court must still address the issue of whether there was a reservation of a strip of land along the western shore of Lake Ariel and Mud Pond on the South Strip (now owned by Asaro/Dring), and, if so, the dimensions of this reservation.

The subdivision line at the southerly property line of Lot 48 falls well within the parcel of land originally conveyed from Weston to Jeremiah Barnes. (Defs.' Ex. 5.) In the Weston-Joel Jones deed, there is explicit language attempting to make a reservation of a strip of land bordering Jones Pond/Lake Ariel. (Defs.' Ex. 4.) It cannot be disputed,

6

due to the inclusion of the parenthetical language in the Weston-Joel Jones deed[6], that

Weston intended to reserve a narrow strip of land between the so-called 'highest flow of

water' and the 'natural margin' of Jones Pond for his own possession.   However, the

Weston-Jeremiah Barnes deed, executed on the very same day, includes no such

parenthetical language.[7]   (Defs.' Ex. 5.)   The parties are in dispute, therefore, over

whether Weston intended to make a similar reservation of a strip of land on the parcel

conveyed to Barnes.   The Court is tasked with resolving this dispute.

Generally, construction of a deed must be governed by the intention of the parties

at the time of the transaction, as gathered from a reading of the entire deed.   *In re Estate*

*of Quick*, 905 A.2d 471, 474-75 (Pa. 2006) (citing *Hindman v. Farren*, 44 A.2d 241, 242

(Pa. 1945) (citation omitted in original)).   In interpreting a deed, unless contrary to the

plain meaning of the instrument, an interpretation given it by the parties themselves will

be favored.   *Lawson v. Simonsen*, 417 A.2d 155, 158 (Pa. 1980) (citing *Brookbank v.*

*Bendum-Trees Oil Co.*, 131 A.2d 103, 107 (Pa. 1957)).   In order to determine the

intention of the parties, the language of a deed should be interpreted in the light of the

subject matter, the apparent object or purpose of the parties, and the conditions existing

when it was executed.   *Id.* (citation omitted).

---

[6]      This deed, in relevant part, provides a metes and bounds description including the language: ". . . to a stones corner on the western margin of the flow of 'Jones Pond', Thence along the margin of the highest flow of water in 'Jones Pond' . . . to a post set for a corner, (leaving the land lying between said highest flow of water and the natural margin of said Pond still belonging to said Edward W. Weston)."

[7]      This deed, in relevant part, provides a metes and bounds description including the language:    " . . . to a post corner on the margin of flow of "Jones Pond", Thence along the margin of the highest flow of water in "Jones Pond" and "Marsh Pond" . . . to a post corner on the Eastern side of a small inlet to "Marsh Pond" . . . ."

When the language of the deed is clear and free from ambiguity, the intent of the parties must be determined solely from the language of the deed. *Teacher v. Kijurina*, 76 A.2d 197, 200 (Pa. 1950). If a deed is ambiguous, however, then all the attending circumstances at the time of execution should be considered to aid in determining the intent of the parties. *Amerikohl Mining Co., Inc. v. Peoples Natural Gas Co.*, 860 A.2d 547, 550 (Pa. Super. Ct. 2004) (citation omitted). Every deed should be so construed as to give effect to the intent of the parties unless it is inconsistent with some rule of law or repugnant to the terms of the grant. This is the ultimate guide by which all deeds must be interpreted. *Rice v. Shank*, 115 A.2d 210, 214 (Pa. 1955) (citation omitted).

While noting that the intent of the grantor is the most important consideration in our analysis, where the words contained in a grant or deed are ambiguous, as is the case here, the deed or grant is to be construed most strongly against the grantor. *Smith v. Hickman*, 14 Pa. Super. 46 (1900) (citing *Klaer v. Ridgway*, 86 Pa. 529 (1878)). "This [rule] applies with especial force to a reservation or restriction in a deed whereby there is a withholding of something from the grant." *Klaer*, 86 Pa. at 529. This rule, mandating construction against the grantor, is limited to situations where the intent of the parties is ambiguous so that it cannot be ascertained from the four corners of the instrument. *Hardes v. Penn Charcoal & Chem. Co.*, 107 A.2d 176, 178 (Pa. Super. Ct. 1954). Thus, for example, the rule will not be applied where the language is sufficiently clear to define the character and extent of any exception or reservation. *In re Condemnation by County of Allegheny of Certain Coal, Oil, Gas, Limestone, Mineral Props.*, 719 A.2d 1, 4 (Pa. Commw. Ct. 1998). Where a deed or agreement or reservation in a deed is obscure or

8

ambiguous, the intention of the parties is to be ascertained in each instance not only from the language of the entire written instrument in question, but also from a consideration of the subject matter and the surrounding circumstances. *Merrill v. Mfrs. Light and Heat Co.*, 185 A.2d 573, 575 (Pa. 1962).

This dispute requires the Court to interpret the Weston-Barnes deed to determine the boundaries of a reservation of land on the so-called South Strip.  The relevant language of the Weston-Barnes deed describes the boundaries of the conveyed parcel as ". . . to a post corner on the margin of the flow of 'Jones Pond', Thence along the margin of the highest flow of water in 'Jones Pond' and 'Marsh Pond' . . . ." (Defs.' Ex. 5.)  Though there is no explicit attempt at a reservation, as there was in the deed from Weston-Joel Jones, the description has only conveyed to Mr. Barnes the parcel along the 'highest flow of water' in Jones Pond/Marsh Pond, leaving the strip between the natural and highest flows of water reserved to Weston.  (Defs.' Ex. 5.)   ALO argues, however, that because various terms such as 'western margin' and 'high water mark' are used interchangeably in the several deeds, it was likely not Weston's intention to make any reservation on the parcel conveyed to Barnes.  They supported this theory at trial by providing the testimony of Daniel Penetar, Esquire, an attorney experienced in title searching.  Mr. Penetar testified that he reviewed all of the deeds, and that several seemingly diverse terms were nonetheless used interchangeably in the various deeds. Specifically, Mr. Penetar stated that in the deeds from Cadwalder-Weston and Weston-William Jones, executed roughly ten (10) months apart, a particular white birch tree is described as being located on the 'western margin', the 'natural western margin', and along the 'high water mark'.  (Penetar Dep. 9:16-10:22, Aug. 28, 2006; Doc. 228 pp. 9-

10.)  Mr. Penetar posited, therefore, that the terms 'high water mark' and 'western margin' must refer to the same line.  (Penetar Dep. 10:21-22; Doc. 228 p. 10.)  Mr. Penetar testified that the deed from Cadwalder to Weston used the language "to a post corner in the western margin of Jones Pond", and "thence northward along the natural western margin of Jones Pond", and that the deed from Weston to Barnes described the same course from a "post corner on the margin of flow of Jones Pond", then "along the margin of the highest flow of water . . . ."  After reciting this language, Mr. Penetar concluded that the deed from Weston to Barnes contained the same property that the deed from Cadwalder to Weston contained.  (Penetar Dep. 7:7-8:1, Doc. 228 pp. 7-8.)

While it may be argued that there is an inconsistency between the inclusion of explicit language making a reservation in the Weston-Joel Jones deed and exclusion of similar language in the Weston-Barnes deed, the language contained in the Weston-Barnes deed unambiguously describes the eastern boundary of the parcel Weston intended to convey as bound by the "highest flow of water", therefore reserving the strip of land lying between the natural and highest flows of water to Weston.  Moreover, given the specific reservation in the Weston-Joel Jones deed, given the simultaneousness of the two transfers and given that the Cadwalder-Weston deed conveyed Weston land upland of the "natural western margin",  the conclusion that Weston intended to and did reserve the strip is the most sensible conclusion.

This strip of land passed to Weston's successors, later to Rensselaer Polytechnic Institute and Wells College, and eventually to Asaro/Dring.  (Defs.' Exs. 23, 24, 53.)

Having found that Weston did in fact reserve a strip of land along the Lake, the Court must now, as the trier of fact, determine the dimensions of the strip.  *See Grace*

*Bldg. Co., Inc. v. Parchinski*, 467 A.2d 94, 96 (Pa. Commw. Ct. 1983) (citations omitted) (holding that the location of a boundary line is a question to be determined by the trier of fact).  None of the deeds contained any statement as to the width of the reservation.  As a matter of law, we must construe any ambiguous language against the grantor (Weston) intending to make a reservation of land.  *See Hickman*, 14 Pa. Super. 46.

There is no width dimension to that parcel in any of those three deeds, nor does it exist in any other deeds in the chain of title.  There is testimony that the natural margin of the Lake was 1423.5 feet above sea level in 1862,  the time of these conveyances. There is no historical evidence of this fact, but there is undisputed engineering evidence which establishes this as a fact by a preponderance of evidence.  There is credible testimony based on old topographical maps, history, principles of hydrology, and expert opinion that the natural level of the Lake is 1423.5 feet, and that it was the same in 1862, the time of the Weston deeds to Jones and Barnes.  There is evidence of the existence of an "old stone dam" in and about 1862 which could account for a difference between the natural margin and the highest flow of water.  Moreover, it is clear from the language of the deeds that Edward Weston reserved to himself a strip of land between the highest flow of water and the natural margin of the Lake.  Therefore, in 1862, something caused the water level to fluctuate.  There was some evidence that when the "old stone dam" was in existence, the highest level of the Lake was 1426.9 feet.  This argues for a reservation width of 3.4 feet (1426.9 - 1423.5). There is also testimony from William F. Schoenagle, the Defendants' expert land surveyor, that he could not presently determine the dimensions of the old stone dam.  However, since a determination beyond 1425.9 feet, the high water mark for in excess of fifty years, only affects Asaro/Dring, the Court

will not consider any dimensions in excess of 1425.9 feet, the high water level claimed by ALO.

While there is evidence of a dam in 1862 which could change the level of the Lake, there is also testimony from Mr. Stover that the level of the Lake never changed through the 1800's.  Indeed, he testified the high and natural water level were the same measurement.  Mr. Stover, a wood or tree expert, so concluded because the trees could not have survived if inundated, and they did, so there was no inundation through the 1800's of the Lake to a level higher than the natural level.  However, Mr. Stover testified that the level of the Lake could change, but not for long periods of time such as six months, and have the trees still survive.  Thus, his testimony does not negate that it changed; only the duration of change.  The summer-winter change is consistent with Mr. Stover's testimony, however, his testimony adds nothing to the dimension issue.

There is no where in ALO's chain of title where ALO  received a grant of the strip reserved to Edward Weston in the 1862 deeds.  There is testimony that by virtue of calculations done today, the reservation of the so-called South Strip is 2.4 feet wide.  I therefore conclude that a reservation width of 2.4 feet of the South Strip is established by a preponderance of the evidence.

Given the foregoing, I conclude that the reservation owned by Asaro/Dring  poses an impediment to ALO's claim of ownership to the Lake to a level of 1425.9 feet above sea level.

ALO has offered other theories to establish its claim.  I will now deal with those.

### 1. ___Adverse Possession / Easement by Prescription

As an alternative to its claim by deed, ALO rests its claim to title of the Lake to a

12

level of 1425.9 feet on the basis that ALO has maintained the Lake to this water mark for

in excess of fifty years.  The testimony is unrefuted that in the summer time the Lake is

dammed so that the water level does rise to a level of 1425.9 feet above sea level, and

in the winter the weir is opened and the Lake level is reduced to 1423.5 feet above sea

level.

Title by adverse possession may be established by proof of actual, continuous,

exclusive, visible, notorious, distinct and hostile possession for twenty-one (21) years.

*Kaminski Brothers v. Grassi*, 352 A.2d 80, 81 (Pa. Super. Ct. 1975).  The word "hostile"

does not mean "ill will" or "hostility", but implies an assertion of ownership rights adverse

to the true owner and all others.  *Schlagel v. Lombardi*, 486 A.2d 491, 494 (Pa. Super.

Ct. 1984) (citing *Vlachos v. Witherow*, 118 A.2d 175 (Pa. 1955)).  If all the elements of

adverse possession are established, hostility is implied.  *Id.*

There is uncontradicted evidence that for at least fifty (50) years, the Lake Ariel

Homeowners raised the level of the Lake from 1423.5 feet to 1425.9 feet for six months

every summer.  The other six months, it was at 1423.5 feet.  There is no question this

conduct caused most of the reservation to be inundated with water and that it was used

for water sports, fishing, docks, etc.  The conduct was visible, notorious, exclusive and

hostile, but was it continuous?  The question is whether six months per year of a high

water mark of 1425.9 feet is sufficient to satisfy the element of continuity.

One could conclude that the presence of the dam, which was known, visible and

continuous for over fifty years was evidence the plaintiffs and their predecessors

exercised dominion and control over the Lake's water level.   The fact that it only

13

inundated defendants' "reservation" for six months of the year does not mean that possession was not continuous.   Since the level of the Lake was controlled by the Plaintiff and its predecessors and the reservation's owners had no control over whether the reservation would be inundated, it could be argued that the element of continuousness is satisfied.

Nevertheless, adverse possession requires continuous uninterrupted use.  I have found no Pennsylvania case which has specifically addressed this issue, and I predict that the Pennsylvania Supreme Court would not find the conduct by ALO and its predecessors to be continuous for purposes of adverse possession.

Therefore, I conclude that title of the "reservation" which is inundated for six months a year is not established by a preponderance of the evidence.

The inquiry does not end there.  It is my view that the conduct of ALO and its predecessors constitutes the acquisition of an easement by prescription in the reservation to the extent of 1425.9 feet above sea level.   While the elements of acquisition of an easement by prescription are much the same as those relating to adverse possession, the element of continuity may be established by a course of conduct indicating an attitude of mind by users that the use is the exercise of a property right. *See*, *Matakitis v. Woodmansee*, 667 A.2d 228 (Pa. Super. Ct. 1995).  *See also*, *Cooper v. Smith*, 1822 WL 1976 (Pa. 1822) (when lower riparian owner erects dam and overflows land of upper riparian owner with latter's knowledge; and maintains dam for over fifty (50) years, upper riparian owner acquires prescriptive easement to flood land, but does not acquire title by adverse possession).  Here the conduct of ALO and its predecessors (building and maintaining a dam and weir and regularly inundating the "reservation" with

14

water which was used for water sports, fishing, docks, etc.) evidences a "settled course of conduct" which satisfies the element of continuity.  *Newell Rod and Gun Club, Inc. v. Bauer*, 597 A.2d 667, 670 (Pa. Super. Ct. 1991) (". . . a settled course of conduct indicating an attitude of mind on the part of the user or users that the use is the exercise of a property right.") (quoting *Minteer v. Wolfe*, 446 A.2d 316, 319 (Pa. 1982)).  Stated another way, the "continuous use" required for adverse possession is the equivalent of "constant use", whereas for the purpose of "establishing a prescriptive easement, constant use need not be demonstrated in order to establish the continuity of the use." *Id.*

Therefore, I find that ALO has not established adverse possession of the "reservation" by a preponderance of evidence, however, I do find ALO and its predecessors have established acquisition of a prescriptive easement to raise the level of the Lake to 1425.9 feet above sea level in the summer months as has been done for in excess of fifty (50) years.  As noted, the presence of the dam was known, visible and continuous.  The dominion and control exercised over the lake level was under the sole control and dominion of ALO and its predecessors.  *Id.*

By the force of the same evidence, ALO and its predecessors have acquired title to the Lake to its natural level of 1423.5 feet above sea level by adverse possession in the face of the presence of the water in open, hostile, continuous, notorious, exclusive and visible possession.

It should be noted that insofar as ALO is concerned, since it was incorporated in 1964 and received purported title to the Lake in 1964, it is then that ALO, as an entity,

began to maintain the Lake.  It is fair to say that the prescriptive easement dates back to 1964, which is well in excess of the twenty-one (21) years required for the accomplishment of a prescriptive easement by adverse activity.  It is also established that ALO's predecessors did the same thing for in excess of thirty-five (35) years.

Although I have found the existence of a prescriptive easement in favor of Plaintiff to a level of 1425.9 feet and title, by adverse possession, to the natural level of 1423.5 feet,  I will consider the other bases ALO asserts as establishing title to the Lake.

### 2. ___Reputation Evidence

ALO also relies on community reputation evidence to establish ownership of the Lake to the high water mark.  ALO cites Federal Rule of Evidence 803(20) which provides as follows:

> Reputation concerning boundaries or general history. Reputation in a community arising before the controversy as to boundaries of or customs affecting lands in the community, and reputation as to events of general history important to the community or state or nation in which located.

This is an exception to the hearsay rule.  ALO presented many witnesses at trial who indicated from their experience in living at the Lake that the reputation was that the Lake was owned by ALO up to the high water mark.  This evidence is admissible under Federal Rule of Evidence 803(20) and is for the support that the boundary of the Lake is at 1425.9 feet above sea level.  I am not convinced that this evidence is any more than an awareness that the Lake was raised in the summer and lowered in the winter.  I am convinced those who testified gathered that this could be done legitimately, but I am not convinced that they took it as expectation that the boundary of the Lake was the high

water mark.

### 3. ___Judicial Decision

The Plaintiffs also urge me to take into account the determination of the Wayne County Court which was affirmed by the Superior Court of Pennsylvania in the suit styled *Stachel v. F. H. S. & E. Development Corp., et al.*, 538-1992-CIVIL, consolidated with 387-1996-CIVIL Wayne Co. CCP, February 5, 1992, *aff'd* Stachel v. F. H. S. & E. Dev., 752 A.2d 429 (table) (Pa. Super. Ct. 2000) as establishing that the boundary line of Lake Ariel is at a high water mark of 1425.9 feet above sea level. This is advanced under the exception to the hearsay rule, Federal Rule of Evidence 803(23) which states "the following are not included by the hearsay rule, even though the declarant is available as a witness: . . . judgments as proof of matters of personal, family or general history, or boundaries essential to the judgment, if the same would be provable by evidence of reputation." FED. R. EVID. 803(23). The Defendants in this case attempted to intervene in that case, and that effort to intervene was denied as follows:

> Adjoining land owners have no basis to intervene in a declaratory judgment when none had any connection with the disputed parcel. Although petitioners' attempt to distinguish this case because it is a declaratory judgment action, this Court does not agree. Even though this is an action to quiet title, the dispute in this case concerns the border between Stachel's property and the lake owned by ALO. That case should be decided on the basis of the deeds and licenses of Stachel and ALO, this border does not affect Stachel's adjoining landowners at all. Even if, as petitioners claim, ALO seeks this Court to designate the boundaries of Lake Ariel, by petitioner's logic, that would require intervention by each of the hundreds of property owners along Lake Ariel. The main issue currently facing this court is the boundary line of Stachel's property. Therefore, the Court does not find that petitioners have legally enforceable interests in this case.

In addition to the inability of Defendants Asaro/Dring to litigate the issue of the boundaries of Lake Ariel in the Stachel case, the issue is further complicated by the fact that the Stachel property is on the easterly shore of Lake Ariel, and, of course, the controversy in this case involves the westerly shore.  Moreover, were it not for the claim of the reservation of the strip of land which begins at 1423.5 feet above sea level, the *Stachel* decision may well be adequate to determine the boundary of Lake Ariel. Given the fact that the court in *Stachel* had no opportunity to consider the question of the reservation and the border implicated thereby, it is inappropriate for me to rely on *Stachel* as authority for establishing a boundary of the Lake.  Even though the water level would be consistent across the length and breadth of the Lake, the fact of ownership of the strip of land reserved by Weston and transferred to Asaro/Dring complicates any determination of the boundary for the entire Lake which did not consider the reservation. The issue of that ownership was never determined, and what rights Asaro/Dring may have in terms of boundaries, vis-a-vis ALO, because of the reservation, was simply not considered.  It would be inappropriate to paint with such a broad brush.  Therefore, I cannot consider the *Stachel* litigation and judgment as determinative conclusively or otherwise on the issue of the boundaries of Lake Ariel as a whole.

**B.____Ownership of the "Reserved" portion of the west shore**

Asaro/Dring claim to be the owners of the strip of land bordering on the Lake which is between the highest flow of water and the natural margin of the Lake.

It is clear that by title transfer, Asaro/Dring have been vested with the title to this piece of land.  The title is traced from Weston to his heirs Rensselaer Polytechnic

Institute and Wells College and to Asaro/Dring.  (Defs.' Exs. 23, 24, 53.)   Moreover, while I have noted that there is evidence of a dam at the Lake in 1862 which could raise the level to 1426.96 feet, I have determined that, for purposes of this case, since a width in excess of 2.4 feet affects only Asaro/Dring, a greater width need not be addressed. I have found that the natural level of the Lake in 1862 was 1423.5 feet, the same as today.   I have determined that the "reservation" or strip owned by Asaro/Dring is established at at least 2.4 feet in width by a preponderance of the evidence.  Therefore, Asaro/Dring have established the dimension of the strip and their  claim to title of it by conveyance.  There is title ownership of a 2.4 foot strip on the western shore of the Lake by Asaro/Dring.

### C.____Lake Ariel - Mud Pond

Asaro/Dring claim there is a non-navigable stream between Mud Pond and Lake Ariel, that it borders on the Asaro/Dring property and that Asaro/Dring's ownership extends to the center of the stream.

### 1.      Non - Navigable Stream

The critical testimony on this issue was from William F. Schoenagel, a surveyor. He concluded there was a stream between Lake Ariel and Mud Pond which flowed to Lake Ariel.  He testified that Asaro/Dring did not own any property bordering on the stream.  Ordinarily, the title to land bordering on a navigable stream extends to the low water mark subject to the rights of the public to navigation and fishing between high and low water.  In the case of land abutting creeks and non-navigable rivers, the title extends to the middle of the stream.  In the case of a non-navigable lake or pond where the land

under the water is owned by others, no riparian rights attach to the property bordering on the water. *Miller v. Lutheran Conference and Camp Ass'n,* 200 A. 646, 649-50 (Pa. 1938) (citations omitted). Title to land underlying non-navigable waters is held by owners of land bordering such waters. *Lehigh Falls Fishing Club. v. Audrejewski,* 735 A.2d 718, 719 (Pa. Super. 1999). While one's land does border the stream, there are no riparian rights in the stream. *Burke v. Demillier*, 15 Pa. D.&C. 4th 633, 635 (Pa. Com. Pl. 1992) ("A person cannot be a riparian owner unless he owns either the shore or the bed of the lake."). This testimony was supported by Exhibit 4, a map showing the lands of Nancy Asaro and Lori Dring and others. (Defs.' Ex. 51D.) On that map, Mr. Schoenagel plotted the stream and demonstrated that Asaro/Dring property did not border the stream. Mr. Ahnell, also called by Asaro/Dring, testified that the stream is on the border of the Asaro/Dring property, and that the stream was much wider than Mr. Schoenagel testified to. This conflict in testimony bears out the uncertainty and vagueness associated with definitive dimensions in the case. Mr. Ahnell was not convincing in his testimony which conflicted with Mr. Schoenagel. At trial, the latter surveyed the property and placed the stream on the drawing board based on his observations. Mr. Ahnell's testimony that Mr. Schoenagel's line of the stream was not accurate is not enough to refute Mr. Schoenagel's testimony. At the very least, Asaro/Dring fail in their proof with regard to this issue.

### 2.    Lake Ariel - Mud Pond: Separate Bodies of Water

There is also the issue of whether the Lake and Mud Pond are two separate bodies of water.

The evidence does not support the conclusion that the Lake and Mud Pond are separate bodies of water.

The existence of a stream between the Lake and Mud Pond does not, *ipso facto*, mean they are two bodies of water, and indeed there is no testimony or authority for such a proposition.   Moreover, while there was testimony that dye placed in the water in between the Lake and Mud Pond went toward the Lake, the Teledyne flow meter, which is a sensitive instrument to measure flow, detected no measurable flow from Mud Pond to the Lake.   I conclude there is no stream between the two, and even if there were, it does not establish they are separate bodies of water.

Historically, there is no mention of Mud Pond, which was formerly known as Marsh Pond, as being separate from the Lake.  It does not appear as a separate body of water on any United States Department of the Interior Geological Survey or diagram in evidence.  (Defs.' Exs. 47B, 47C.)  These geological surveys or maps show the Lake, a channel and the collection of water in what is known as Mud Pond, though no name is given to the collection of water.  The Gazetteer of Lakes and Ponds, 19th edition, which was referred to in Mr. Ahnell's report and testimony, mentions Lake Ariel, an inlet and outlet, but makes no mention of a separate pond or body of water.  The Defendants have not shown, by a preponderance of evidence, that Mud Pond is a separate body of water. Indeed, I find, from the evidence, that Mud Pond is simply a part of the Lake.  They constitute one body of water.

### D.    Prescriptive Rights Acquired from Swingle

Defendants claim that their predecessor, Mr. Swingle, acquired prescriptive

easement rights to the use the disputed water area.  "A prescriptive easement is created by adverse, open, continuous, notorious and uninterrupted use of the land for twenty-one years."  *Martin v. Sun Pipeline Co.*, 666 A.2d 637, 640 (Pa. 1995) (citations omitted).

Defendants claim that Mr. Swingle fished, boated and trapped in the disputed water area.  The testimony at trial regarding each of those activities established that it was not continuous for the period of twenty-one (21) years.  Moreover, Mr. Swingle testified that he believed that he was using the lake with the consent of the owners.  Therefore, there is no prescriptive easement in the use of the Lake for fishing, boating or trapping.

Defendants also claim that they acquired a prescriptive easement to water cattle by virtue of the first Swingle deed.  (Defs.' Ex. 21.)  The deed conveys any prescriptive rights acquired by Swingle to Asaro/Dring.  It is true that the conveyance would convey any prescriptive rights acquired.   In this connection, Asaro/Dring contend that the placement of a fence seventy-five (75) feet into what is known as Mud Pond supports the claim for the acquisition of rights in and to the pond. The testimony of Mr. Swingle does not establish whether the fence went into the pond, into the channel, or fell short of both.  Mr. Swingle testified there was a fence that went out into the swamp so the cows could not go around it.  There is no reference point as to the start of the seventy-five (75) feet, nor is there a reference point to its ending.  The testimony is that the fence went out into the swamp.  This could be the area around Mud Pond or the area resulting from low water at a time when a dam was not in use.  There is no evidence from which I could conclude that Defendants have proven a prescriptive right into Mud Pond because of the fence.  It is simply insufficient to establish any significance in support of the Asaro/Dring

22

claim.

Therefore, as to fishing, boating and swimming, none of the activities by Mr. Swingle or his family were regular and continuous, nor did they span a period of twenty-one (21) years.   Moreover, as indicated, there was a question as to adverse and notorious since Mr. Swingle indicated in his testimony that he thought he had permission from lakeside land owners to use the Lake when he did use it.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.      Parties

### FINDINGS OF FACT

1.   Plaintiff and Counterclaim Defendant, Ariel Land Owners, Inc. (ALO) is Pennsylvania corporation maintaining an address within the Commonwealth of Pennsylvania at P.O. Box 503, Lake Ariel, Pennsylvania, 18436, with its principal office and place of business in the Commonwealth of Pennsylvania.

2. Defendant and Counterclaim Plaintiff and Counterclaim Defendant, Lori Dring, is an adult individual residing at 29 Sleepy Hollow Drive, Oakridge, New Jersey, and is a resident and citizen of the State of New Jersey.

3.   Defendant and Counterclaim Plaintiff and Counterclaim Defendant, Nancy Asaro, is an individual residing at 28 Trenton Terrace, Wayne, New Jersey, and is a citizen of the State of New Jersey.

4.   Counterclaim Defendants, Karl K. and Alice Iffland, are owners of approximately sixty (60) vacation homes on the western shore of Lake Ariel.

**B.      Jurisdiction**

Jurisdiction exists on the basis of Diversity of Citizenship, 28 U.S.C. § 1332.

**C.      Ownership of Lake**

**FINDINGS OF FACT**

1.  The lake is fed by springs.  It has an inlet at its northeast corner and an outlet at its southeast corner.  The outlet includes a dam.

2.  For in excess of fifty (50) years, the dam has been closed during the warm weather months so as to maintain the water of the lake at a level of 1425.9 feet above sea level.  During the period the lake freezes, the dam is opened and the lake returns to its natural level of 1423.5 feet above sea level.  The Plaintiff and Defendants both trace their title to their respective properties to Edward Tilghman, who obtained a large parcel of land from the Sheriff of Wayne County in February of 1801.  The parcel included Lake Ariel and Mud Pond and all other real estate claimed and/or owned by ALO, Asaro/Dring and Iffland.

3.  The boundary of the land under Lake Ariel and Mud Pond is not described by metes and bounds description in any deed in the chain of title of ALO.

4.  In the deed in ALO's chain of title, recorded in the Office of the Recorder of Deeds of Wayne County in Deed Book 51, page 562, from John Torrey to Simon Swingle, dated December 20, 1877, the property conveyed is described as follows:

> All that certain lot or parcels of land situate in what was recently the Township of Salem in said county (including all or nearly all of the ponds called Jones Pond and Marsh Pond, respectively).

(Pl.'s Ex. 151F).  Plaintiff's Exhibit 151F further contains the following:

> Thence along or near the margin of said Marsh Pond and Jones Pond, respectively, by the lines of lots conveyed by M. Cadwalder and Tilghman, respectively to the various purchasers around said ponds Northerly, Easterly, Southerly and Westerly to a northeastern corner of land . . .

5.   The foregoing language is repeated in deeds forming ALO's chain of title up to the deed from Flora M. Schadt, et al. to Floyd E. Bortree, et al., dated October 15, 1922, and recorded in the Office of the Recorder of Deeds of Wayne County in Deed Book 119, page 184.  (Pl.'s Exs. 151F -151L.)  The deed into ALO from A.J. Schrader and Florence Schrader dated April 20, 1964, and recorded in the Office of the Recorder of Deeds of Wayne County, in Deed Book 221, page 292, contains the following description of the property conveyed to ALO:

> "No. 1 All of a certain parcel of land and of land covered with water known originally as 'Jones Pond' and 'Marsh Pond' and in recent years 'Lake Ariel'.  The boundary thereof following the shore line of the said Lake as said shore line is defined in the several deeds conveying lands bordering on said Lake."

 (Pl.'s Ex. 151R.)

6.   The parcel of land under the waters of Lake Ariel and Mud Pond acquired by the Plaintiff traces its origin to the deed from Torrey to Swingle (Pl.'s Ex. 151F) and is a remnant deed.

7.   In order to determine what remained from the Torrey to Swingle deed, it is necessary to examine all of the deeds conveyed in all known directions at or around the Lake by deeds from those preceding Torrey in the chain of title of ALO.

8.   There is no evidence of what has been conveyed out so as to determine what remained to be conveyed by Torrey to Swingle in Plaintiff's Exhibit 151F.

25

9.  The deed into ALO contains two parcels, one of approximately 300 acres and another of approximately 13.5 acres.

10.  I find, by a preponderance of the evidence, that ALO has not established record title to the property which includes the area of Lake Ariel and Mud Pond to its natural water level of 1423.5 feet or its high water level of 1425.9 feet.

11.  I find that since 1964, ALO has maintained actual, continuous, exclusive, visible, notorious, distinct and hostile possession of Lake Ariel and Mud Pond to its natural water level of 1423.5 feet.

## CONCLUSIONS OF LAW

1.  ALO does not have record title to Lake Ariel and Mud Pond to its natural level of 1423.5 feet nor its high water level of 1425.9 feet by virtue of the 1964 deed.

2.  ALO has title to Lake Ariel and Mud Pond to its natural level of 1423.5 by virtue of adverse possession. *Kaminski Brothers, Inc. v. Grassi*, 352 A.2d 80, 81 (Pa. Super. Ct. 1975), *Schlagel v. Lombardi*, 486 A.2d 491 (Pa. Super. Ct. 1984) (*citing Vlachos v. Witherow*, 118 A.2d 174 (Pa. 1955)).

### D.    **Asaro/Dring Ownership of West Shore Strip**

### FINDINGS OF FACT

1.  By deed dated December 13, 1859, and recorded in Wayne County Deed Book 28, page 36, George Cadwalder, Esquire, Executor of the Last Will and Testament of Mary Cadwalder, conveyed property owned by him along the west shore of Lake Ariel to Edward W. Weston. (Defs.' Ex. 2.)

26

2.  This deed included four hundred (400) acres of land bordering Lake Ariel and Mud Pond and lying upland of the natural western margin.

3.  By deed dated October 3, 1860, and recorded in Wayne County Deed Book 28, at page 92, Edward Weston deeded part of the four hundred sixty-four (464) acres to William Jones.  In the deed, the easterly boundary was described as the "high water mark along the water of said pond".  (Defs.' Ex. 3.)

4.  By deed dated January 21, 1862, and recorded in Wayne County Deed Book 30, at page 39, Edward W. Weston deeded part of the four hundred sixty-four (464) acres to Joel Jones.  This deed contains the following language: "Thence along the margin of the highest flow of water in Jones Pond leaving the land between the highest flow of water and its natural margin of said pond still belonging to Edward W. Weston". (Defs.' Ex. 4.) This conveyance specifically reserved to Edward W. Weston the land lying between the natural margin and the margin of the highest flow of water.

5.  By deed dated the same day, January 21, 1862, and recorded in Wayne County Deed Book 30, at page 40, Edward W. Weston conveyed part of the four hundred sixty-four (464) acres to Jeremiah T. Barnes.  (Defs.' Ex. 5.)  This deed described the easterly boundary along Lake Ariel as: "Thence along the margin of the highest flow of water in Jones Pond and Marsh Pond . . ."  The land between the natural margin and the highest flow of water remained in Edward W. Weston.

6.  By virtue of these conveyances, a strip of land between the natural margin of Lake Ariel and Mud Pond and high water mark or margin of the highest flow of water, was reserved to Edward W. Weston.

27

7.  Edward W. Weston died October 28, 1891, and his estate was raised in the Lackawanna County Register of Wills Office to No. 2277 of 1891.

8.  As Edward W. Weston never conveyed the so-called west shore strip prior to his death, it devolved under his residuary estate to his wife, Susan W. Weston.

9.  Susan W. Weston died Marsh 25, 1916, and her will was admitted to probate in Lackawanna County in the Register of Wills Office and indexed to No. 242 of 1916.

10.  Susan W. Weston did not convey the so-called west shore strip prior to her death, and since her will made no reference to the west shore strip as a specific devise, it passed under her residuary estate to her son, Charles W. Weston, and her daughter Caroline Weston Bird.  (Defs.' Ex. 53.)

11.  Caroline Weston Bird died October 7, 1931, and her will was admitted for probate in Suffix County, Massachusetts to No. 251513 of 1931, recorded in Volume 1527, at page 42.

12.  As Caroline Weston Bird did not convey the so-called west shore strip prior to her death, and since her Last Will and Testament made no specific devise of the west shore strip, it devolved under her residuary estate to her brother, Charles W. Weston. (Defs.' Ex. 53.)

13.  Charles W. Weston died October 14, 1947, and his will was admitted to probate in Lackawanna County Register of Wills Office to No. 939 of 1947.

14.  As Charles W. Weston did not convey the so-called west shore strip prior to his death, and since his Last Will and Testament made no specific devise of the west shore strip, it devolved under Sections 29 and 30 of his probated will which provided that the residuary of his estate be divided one-third to Wells College of Aurora, New York, and

28

two-thirds to Rensselaer Polytechnic Institute of Troy, New York.  (Defs.' Ex. 53.)

15.  Wells College conveyed its one-third interest in the so-called west shore strip to Lori Dring and Nancy Asaro by quitclaim deed dated December 6, 2001, and recorded in Wayne County Deed Book 931, page 204.  (Defs.' Ex. 23.)

16.  Rensselaer Polytechnic Institute conveyed its two-thirds interest in the so-called west shore strip to Lori Dring and Nancy Asaro by quitclaim deed dated November 2, 2001, and recorded in Wayne County Deed Book 1931, at page 209.  (Defs.' Ex. 24.)

17.  Neither Wells College nor Rensselaer Polytechnic Institute conveyed any interest to the so-called west shore strip prior to the conveyances to Lori Dring and Nancy Asaro.

18.  As a result of a Settlement Agreement (Jt. Ex. 1), Asaro/Dring conveyed to ALO all of their right, title and interest to that portion of the west shore strip lying north of the southerly property line of Lot 48 as shown on Defendant's Exhibit 51D.

19.  The use of the term "natural margin and highest flow of water" in reference to the east boundary lines of the west shore in the deeds from Weston to William Jones, Joel Jones and Jeremiah Barnes indicate a raising and lowering of the water level of Lake Ariel and Mud Pond.

20.  Even though Edward Weston did not specifically reserve a portion of the land in his conveyance to Jeremiah Barnes, he did describe the easterly boundary of the property as the highest flow of water.  Given his use of the reservation between the natural margin and the highest flow of water in the deed from Mr. Weston to Joel Jones, on the same day as the deed into Barnes, it is clear that Mr. Weston did not convey any land beyond the highest flow of water to Mr. Barnes.

21.   Therefore, the ownership of the west shore strip south of the portion which was conveyed in the Settlement Agreement is vested in Lori Dring and Nancy Asaro.

22.  I find that the natural margin of Lake Ariel and Mud Pond is 1423.5 feet above sea level.  The Court also finds that the natural margin of Lake Ariel at or about the time of the conveyances to William Barnes, William Jones, Joel Jones and Jeremiah Barnes was 1423.5 feet above sea level.

23.  The reservation of the South Strip is 2.4 feet, or the difference between the natural margin of 1423.5 feet and the highest flow which is 1425.9 feet above sea level.

## CONCLUSIONS OF LAW

1.  Asaro/Dring have established their ownership by record title to the west shore reservation of the South Strip to a width of 2.4 feet.

### E.      Easement in the Reservation Owned by Asaro/Dring

### FINDINGS OF FACT

1.  For over fifty years, ALO and its predecessors raised the level of the Lake in the warm months (approximately 6 months) from its natural level of 1423.5 feet to 1425.9 feet above sea level.

2.  The presence of the dam, which permitted this change in the level of the Lake, was known to all the surrounding owners, including Asaro/Dring, and their predecessors in title.

3.  The presence of the dam and the raising and lowering of the Lake's water level was actual, exclusive, visible, notorious and distinct.

4.  There was, in the exclusive raising and lowering of the level of the Lake, as was done by use of the dam, a course of conduct which satisfies the element of continuity when considering the establishment of an easement by prescription.

## CONCLUSIONS OF LAW

1.  There was, in the exclusive raising and lowering of the level of the Lake, as was done by use of the dam, a course of conduct which satisfies the element of continuity when considering the establishment of an easement by prescription.

2.  ALO has a prescriptive easement in the South Strip reservation owned by Asaro/Dring on the western shore of the Lake.  See *Matakitis v. Woodmansee*, 667 A.2d 228 (Pa. Super. Ct. 1995).  *Newell Rod and Gun Club, Inc. v. Bauer*, 597 A.2d 667 (Pa. Super. Ct. 1991).  *See also, Cooper v. Smith*, 1822 WL 1976 (Pa. 1822).

### F.    Lake Ariel - Mud Pond - Non-Navigable Stream

## FINDINGS OF FACT

1.  There is no non-navigable stream between Lake Ariel and Mud Pond.

2.  Lake Ariel and Mud Pond comprise a single body of water; not two separate bodies of water.

3.  Lake Ariel - Mud Pond is a non-navigable body of water.

## CONCLUSIONS OF LAW

1.  There is no non-navigable stream between Lake Ariel and Mud Pond.

2.  Lake Ariel and Mud Pond comprise a single body of water; not two separate bodies of water.

3.    Lake   Ariel  -  Mud   Pond   is   a   non-navigable   body   of   water.

**G.    Prescriptive Rights from Swingle**

### FINDINGS OF FACT

1.  Mr. Swingle's fishing, boating, swimming and trapping activities were not adverse, because he believed he had the consent of the owner of the Lake to engage in those activities.

2.  Mr. Swingle's fishing, boating, swimming and trapping activities were not continuous and uninterrupted for twenty-one (21) years.

3. Mr. Swingle's fence that went seventy-five (75) feet into the swamp is not sufficient to establish its presence into the pond or channel.  There is no reference point as to the start or end of the seventy-five (75) feet.

### CONCLUSIONS OF LAW

1.    Mr. Swingle did not acquire an easement by prescription in the "Lake/Pond/Stream" as no use was adverse, open, continuous, notorious or uninterrupted for twenty-one (21) years. *See Martin v. Sunpipe Line*, 666 A.2d 637, 640 (Pa. 1995).


Date: January 18, 2008                    /s/ A. Richard Caputo
                                          A. Richard Caputo
                                          United States District Judge